## BENSON HOTEL CORPORATION v. CITY OF MINNEAPOLIS AND OTHERS.
## THE MIKULAY COMPANY, INC., AND OTHERS, INTERVENORS.

187 N. W. (2d) 610.

March 26, 1971—No. 42287.

*Keith M. Stidd,* City Attorney, for appellants.
*Helgesen, Peterson, Engberg & Spector, Roger A. Peterson,* and *Robert J. Tennessen,* for respondent plaintiff.

*O'Connor, Green, Thomas, Walters & Kelly, Joe A. Walters, Robert J. Christianson, Jr.,* and *Frank J. Walz,* for respondent intervenors.

Heard before Knutson, C. J., and Nelson, Otis, Peterson, and Rosengren, JJ.

OTIS, JUSTICE.

This action is brought by two property owners to enjoin the city of Minneapolis from enforcing an ordinance which changes Third Avenue South from a two-way street to a one-way street for northbound traffic. The trial court permanently enjoined the city from enforcing the ordinance, and the city appeals.

The issues are (1) whether the Municipal Housing and Redevelopment Act has limited the jurisdiction of the city of Minneapolis to prevent it from unilaterally creating one-way streets within the Gateway Center Urban Renewal area; (2) whether a cooperation agreement entered on February 17, 1961, between the Minneapolis Housing and Redevelopment Authority and the city of Minneapolis requires the city to secure the Authority's approval before changing streets within the renewal area from two-way to one-way; and (3) whether a property owner outside the renewal area whose business is adversely affected by the change is entitled to a permanent injunction. We answer the questions in the negative and reverse.

The ordinance under attack was adopted over the mayor's veto on August 28, 1969. It changes Third Avenue South in downtown Minneapolis from a two-way to a one-way street permitting traffic to travel only in a northerly direction between 12th Street and Washington Avenue. Plaintiff, Benson Hotel Corporation, owns and operates the Leamington Hotel which abuts Third Avenue and occupies about half the block bounded by Third Avenue, 10th Street, Second Avenue, and 11th Street. The hotel is 6 blocks from the urban renewal area. Third Avenue is the boundary of the renewal area between First and Second Streets, the south half of the block between Washington and Third Street,

and between Third Street and Fourth Street. It runs through the renewal area in the north half of the block between Washington and Third Street.

In essence, Benson argues that the ordinance is illegal but asserts that even if it is found to be valid its adoption would irreparably harm Benson's hotel business by requiring circuitous access to the main entrance and to its parking lot west of the building.

The Mikulay Company, Inc., and two of its shareholders intervened to join Benson in attacking the validity of the ordinance. Mikulay owns two open-air parking lots within the renewal area facing Washington Avenue in the north half of the blocks bounded by Third Avenue, Third Street, and Fifth Avenue. It alleges that it will suffer damages from the change of traffic patterns for two reasons. First, the change will prevent cars, which now approach from the north across Washington Avenue, from making a left turn into the driveway which now abuts Third Avenue. Although traffic can enter the lots by making a left turn at Washington, Mikulay argues that the congestion at that intersection during the morning rush hour, when a great many people park their cars, will discourage motorists from approaching the lots in that manner.

A principal argument on which Mikulay relies stems from the city's plan, set forth in the ordinance in question, to divert southbound traffic from Third Avenue west on Second Street, and thence south on Second Avenue, which is a one-way street. The Gateway Center Urban Renewal Plan has set aside the block bounded by Third Avenue, Second Street, Second Avenue, and First Street for commercial and residential purposes. Until the area in that block is actually developed, the authority will continue to lease the land for parking in competition with Mikulay. Mikulay has been granted the exclusive right within the renewal area to operate an open air parking lot until the year 1990. It contends that the ordinance will result in seriously depressing the market for the sale of the block described because of the

heavy traffic which will travel in front of it on Second Street, destined for Second Avenue. Consequently, that area will remain in competition with Mikulay to its continuing detriment.

Minneapolis City Charter, c. 8, § 1, provides:

"The City Council shall have the care, supervision and control of all highways, streets, alleys, public squares and grounds within the limits of the city * * *."

As we noted in The Alexander Co. v. City of Owatonna, 222 Minn. 312, 324, 24 N. W. (2d) 244, 252, charter provisions of this kind vest in municipalities extensive police power. Consequently, unless the legislature has expressly limited the right of a municipality to regulate traffic on its streets, or unless it has authorized municipalities to contract away that right, the ordinance here in question enjoys a presumption of validity.

The Municipal Housing and Redevelopment Act, Minn. St. 462.411 to 462.711, confers broad authority on entities such as the Minneapolis Housing and Redevelopment Authority. Under an "urban renewal project," property may be acquired to reduce traffic hazards and install, construct, or reconstruct streets. § 462.421, subd. 13. However, for whatever inference may be drawn, the city points out that in 1947, when the original act was adopted, "redevelopment plan" included "improved traffic" as one of the objectives to which it related. The reference to traffic was deleted by L. 1959, c. 545, § 1. We find no provision in the statute which expressly or by implication confers on a municipal housing and redevelopment authority either the right to regulate the flow of traffic within the renewal project or the power to overrule decisions reached by the municipal authorities in traffic matters. This is not to say that traffic patterns do not play an important role in urban planning. That fact is recognized in the statute. It is one which must be weighed and considered both by the municipality and the housing authority in developing renewal areas. However, in the absence of a clear intent by the legislature to delegate the power to regulate traffic flow, we hold

that the Municipal Housing and Redevelopment Act does not in itself deprive the city of its inherent and traditional power to regulate traffic on its streets.

■ The question then arises as to whether, apart from statute, the city of Minneapolis has entered an agreement with the housing authority which permits a sharing of responsibility for regulating traffic within the Gateway Renewal Project. The agreement of February 17, 1961, to which we have alluded, contains a number of references to the use of streets. The preamble recites that the project involves the acquisition of property "and the provision of streets" for reuse of land in accordance with the redevelopment plan. It further provides:

"The Local Government agrees that it will provide as a local non-cash grant-in-aid to the project, site clearance work, streets, alleys, curb and sidewalk, and sewer and water disconnection work; site improvement work including sewer, water supply, curb, sidewalk, road and alley surfacing, road base, street lighting, relocation and construction of traffic semaphores, parking meters, traffic signs and call boxes, * * *.

"The Local Government in accordance with the Redevelopment Plan and at no cost or expense to the Local Public Agency, shall vacate streets, roads, alleys, and other public ways as provided by said Redevelopment Plan after the abutting property and the underlying fee in the streets, alleys and other public ways shall have been acquired by the Local Public Agency.

"The Local Public Agency either by dedication or grant will convey to the Local Government without cost all such public easements and streets as are set forth or described in said project, * * *."

We do not construe the agreement as expressing an intention on the part of the city to abdicate its authority to regulate traffic on streets running through the renewal project. However, the city does agree to cooperate with the housing authority in taking

whatever lawful action is necessary or desirable to carry out the purposes of the project.

Mikulay and Benson lean heavily on documentation[1] compiled in support of the renewal plan which stresses the necessity for maintaining Second Avenue and Marquette Avenue as interior streets rather than arterial highways in the Gateway Project. The plan which the city proposes under the ordinance would make Second Avenue a part of State Highway No. 65 for southbound traffic. This, it is argued, runs counter to the proposal which the city has approved. Great reliance is also placed on a document which cryptically, and in tabulation form, shows Third Avenue South from Washington to Fourth Street to be two-way under the plan. On the other side of the coin, the documentation also contains a map with a single arrow pointing north on Third Avenue. The legend states that arrows show the direction of traffic. At best, we find these references conflicting and irreconcilable and give little weight to either of them.

The basic legal question, according to Benson and Mikulay, is whether the changing of the traffic pattern contemplated by the ordinance is a modification of the renewal plan within the meaning of § 462.525, subd. 6, which provides as follows:

"A redevelopment plan may be modified at any time before or after the lease or sale of the project area or parts thereof, provided the modification shall be adopted by the authority and the governing body of the political subdivision in which the project is located, upon such notice and after such public hearing as is required for the original adoption of the redevelopment plan: Provided, however, that where the authority determines the necessity of changes in an approved redevelopment plan or approved modification thereof, which changes do not alter or affect the exterior boundaries, or do not substantially alter or affect the general land uses established in such plan, such changes shall not constitute a modification of the redevelopment plan nor require

---

[1] See Appendix.

approval by the governing body of the political subdivision in which the project is located."

In support of the argument that the statute applies, Benson and Mikulay cite two instances as precedent. When the so-called "Nicollet Mall" was planned, the city consulted the housing authority and conducted a public hearing on the matter. It is argued that this was a recognition by the city of its obligation to secure the acquiescence of the authority. The city, on the other hand, takes the position that the proposed use of Nicollet was such a drastic departure from ordinary street purposes that it went beyond the question of simply regulating traffic. Consequently, it was appropriate for the city to secure the approval of the housing authority and hold a public hearing since the area affected was within the Gateway Renewal Project.

A second instance cited by Mikulay and Benson is the district court's disposition of a city ordinance authorizing an overpass across Washington Avenue from Third Avenue to Third Street and Fourth Avenue. This project would have required the city to acquire by condemnation a fee interest or easement in a portion of one of Mikulay's parking lots over which the elevated highway was to have been constructed. Mikulay brought appropriate proceedings to enjoin the city from pursuing this plan and the district court granted a permanent injunction. In a memorandum accompanying the decision, the court held that the ordinance proposed a modification of the renewal plan which, under the statute, had to be submitted to the housing authority for approval. This was not done. The city in that case had taken the position the modification was a minor one which did not require approval. No appeal was taken from the court's decision.

There are decisive differences in the problems raised by the ordinance authorizing an overpass across one of Mikulay's parking lots and the ordinance which changes Third Avenue from a two-way to a one-way street. In proposing an overpass, the city was not simply dealing with the management of traffic within

the physical boundaries of streets over which they already had easements. The bypass contemplated an actual taking of property within the renewal project, both to support the physical structure and to occupy air space which belonged to the fee owner. This clearly was a modification under § 462.525, subd. 6, and required the city to follow the procedures prescribed therein.

We find nothing in the renewal plan or the cooperation agreement which is inconsistent with the rights the city here asserts. There is no proposed departure from ordinary street uses, no taking of abutting property, nor any extraordinary deviation from the usual functions of a municipality in working out traffic patterns. The actual impact on Mikulay's own property is minimal and speculative. The damages Mikulay foresees from perpetuating competition are remote and afford no basis for relief. It is conceivable that a city can so drastically alter its traffic patterns a renewal plan is subverted and frustrated. We find nothing approaching those dimensions in the case before us. Third Avenue South is presently the main artery between the freeways and the Third Avenue bridge. The city has determined that such traffic could be better and more expeditiously served by dividing it between Third Avenue and Second Avenue and we have difficulty in understanding how this dilution will impair the integrity of the renewal project.

■ Benson's rights are essentially contingent on the disposition of Mikulay's claim since the Leamington is not included within the renewal project. However, independent of the validity of the ordinance, Benson asserts it is entitled to relief for the irreparable damage resulting from the inconvenience which will be experienced by its patrons. Benson points out that prospective guests approaching from the north can no longer use the front entrance on Third Avenue without driving up Fourth Avenue and going west on 11th Street. To reach the parking lot after stopping at the main entrance on Third Avenue, they will be required to drive to Ninth Street and turn south on Second Avenue. Such circuity, it is alleged, will result in a reduction in room oc-

cupancy of 5- to 20-percent, diminishing the value of the hotel by at least $362,000. The trial court so found.

Benson relies on Thomsen v. State, by Head, 284 Minn. 468, 170 N. W. (2d) 575; and Gibson v. Commr. of Highways, 287 Minn. 495, 178 N. W. (2d) 727. Both cases suggest property owners may be entitled to damages without an actual taking if the adjacent highway causes them unique damage. We find nothing unique in the circumstances of the case before us. Benson has not sought damages, and under our decision in Hendrickson v. State, 267 Minn. 436, 446, 127 N. W. (2d) 165, 173, it has no cause of action for "diversion of traffic or for loss of customers, business, goodwill, income, or profits" simply because of its circuity of access. No case has been called to our attention, and we are aware of none, where, without a taking, a property owner is entitled to damages for the inconvenience experienced by a change of direction in the flow of traffic on the street which abuts his property.

Reversed.

### Appendix

Excerpts from supporting documentation to Gateway Center Urban Renewal Plan.

"Third Avenue South is the only street which connects directly with one of the two bridges which link the central business district with the northeastern segment of Minneapolis and at present serves as the most direct truck route to St. Paul's downtown and major industrial areas. Traffic volumes upwards of 20,000 cars per day must be accommodated. At present, 2nd Avenue South which is one-way south handles much of the traffic coming off of the bridge and northbound traffic uses 3rd Avenue and Marquette Avenue. 2nd Avenue and Marquette Avenue function as a one-way pair. Both of these streets are interior streets in the Gateway Project. Their use for through traffic is detrimental to the successful renewal of the area, since sufficient traffic with destinations in the Gateway Area and adjacent portions of the central business district will exist to absorb the capacity of these two streets without adding a considerable volume of through traffic. * * *

"Projected Freeway construction will siphon off some of the through traffic; however 3rd Avenue will remain as a major distributor. * * *

\* \* \* \* \*

"It is the objective of the Renewal Plan to eliminate through traffic wherever possible and to serve the area by a system of distributor and local access streets. * * * Hennepin and 3rd Avenues connect to bridges and likewise will serve as both distributor and through streets until proposed local and federal-state expressway construction relieves them of most through traffic * * *. Even with freeway construction, it will be necessary to widen 3rd Avenue, particularly north of Washington Avenue. Toward this end, 3rd Avenue will be widened 18' between 1st and 2nd Streets making a wide roadway which will accommodate the capacity eliminated by the closing of 2nd Avenue at that point. * * * Marquette, 2nd Street, Nicollet, and 2nd Avenue will function as local access streets. Street closings are designed to limit the use of these streets to access and also to provide more open space around new buildings. The 2nd Avenue closing is designed to integrate the residential development and to channel through traffic around the project."